**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MAZ ENCRYPTION TECHNOLOGIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-306-LPS |
| | ) | |
| HEWLETT-PACKARD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff MAZ Encryption Technologies LLC ("Plaintiff" or "MAZ") filed the instant

patent infringement suit against Defendant Hewlett-Packard Company ("Defendant" or "HP").

Presently pending before the Court is Defendant's motion to transfer venue to the Northern

District of California ("Motion"). (D.I. 20) For the reasons that follow, the Court recommends

that Defendant's Motion be DENIED.[1]

## I.    BACKGROUND

### A.    Procedural History

The instant case was filed on February 22, 2013, and was one of seven cases filed by

Plaintiff on that day in this Court, each alleging patent infringement against a different

---

[1]        There is a split of authority in the courts as to whether a motion to transfer venue should be treated as a dispositive or non-dispositive motion. *See Pragmatus AV, LLC v. Yahoo! Inc.*, C.A. No. 11-902-LPS-CJB, 2013 WL 174499, at *1 & n.1 (D. Del. Jan. 16, 2013); *see also McKee v. PetSmart, Inc.*, C.A. No. 12-1117-SLR-MPT, 2013 WL 1163770 (D. Del. Mar. 20, 2013) (titling decision on motion to transfer venue as "Report and Recommendation"), *report and recommendation adopted*, 2013 WL 2456719 (D. Del. June 5, 2013). There is, however, precedent from our Court suggesting that such a motion is most properly treated as not dispositive. *See, e.g., In re Heckmann Corp. Secs. Litig.*, C.A. No. 10-378-LPS-MPT, 2011 WL 1219230, at *1 (D. Del. Mar. 31, 2011). Nevertheless, in an abundance of caution, the Court will title this document as a "Report and Recommendation."

defendant.[2]  On April 25, 2013, Plaintiff filed two additional patent infringement suits in this

Court, again each against a different defendant.[3]  On February 21, 2014, Plaintiff filed another

patent infringement suit in this Court, asserting an additional patent against a defendant

previously sued in February 2013.[4]  In total, of the other nine related cases Plaintiff filed in this

Court, seven of the cases involve allegations of infringement of one or both of the patents-in-suit;

the other two cases involve allegations regarding a related patent to the patents-in-suit. (D.I. 33

at 3); *see also* Civil Action No. 14-228-LPS, D.I. 1 at ¶ 1 (D. Del. Feb. 21, 2014).  All ten cases

are assigned to Judge Leonard P. Stark.

In this case, Plaintiff alleges that Defendant directly and indirectly infringes the patents-

in-suit—patents Plaintiff asserts "cover[] novel technologies relating to encryption." (D.I. 33 at

2)  Plaintiff's First Amended Complaint ("FAC") avers that Defendant has been and is directly

infringing these patents by "among other things, making, using, importing, offering for sale,

and/or selling" certain computer encryption products and systems, including Defendant's:  (1)

HP-UX 1 1i Encrypted Volume and File System ("EVFS"); and (2) HP ProtectTools and

fingerprint readers. (D.I. 14 at ¶¶ 9, 18)  Plaintiff also alleges indirect infringement, *inter alia*,

via Defendant's sale or offers for sale to its customers of certain software and hardware products.

(*Id.* at ¶¶ 11-12, 20-21)

On May 23, 2013, HP answered the FAC. (D.I. 16)  A joint proposed Scheduling Order

---

[2]      The case numbers for the other six cases filed on February 22, 2013 are:  13-299-
LPS; 13-300-LPS; 13-301-LPS; 13-303-LPS; 13-304-LPS; and 13-305-LPS.

[3]      The case numbers for these two cases are 13-729-LPS and 13-730-LPS.

[4]      The case number for this case is 14-228-LPS.

that would govern all but the most recently filed case, including this one, has subsequently been submitted to Judge Stark by the parties in each of those related cases. (*See, e.g.*, D.I. 43)

On February 4, 2014, Judge Stark referred the instant Motion to the Court for resolution. (D.I. 44) The Court held oral argument on the Motion on February 24, 2014. (D.I. 52 (hereinafter, "Tr."))

### B.    The Parties and Related Facts, Persons and Entities

Plaintiff MAZ is a Delaware limited liability company ("LLC") and owns, via assignment, the patents-in-suit: United States Patent Nos. 6,185,681 and 8,359,476. (D.I. 14 at ¶¶ 1-2, 8, 17) The filing dates regarding the patents-in-suit were in 1998 and 2010, respectively, and they were issued in 2001 and 2013, respectively. (*Id.*, exs. A & B)

Plaintiff was formed on February 13, 2013. (D.I. 26 ("Allen Decl."), ex. A) Plaintiff's LLC has two members (Daniel Mitry and Timothy Salmon); one lives in New York City and the other in Basking Ridge, New Jersey. (D.I. 36 ("Mitry Decl.") at ¶¶ 2-3; D.I. 37 ("Salmon Decl.") at ¶¶ 2-3) Plaintiff's members both assert, as to Plaintiff's current financial condition, only that Plaintiff "does not currently have any revenue." (Mitry Decl. at ¶ 2; Salmon Decl. at ¶ 2)

Stephen J. Zizzi is the inventor of the patents-in-suit. (D.I. 14 at ¶ 1; D.I. 38 ("Zizzi Decl.") at ¶ 2) In 1996, Mr. Zizzi and Chris Mahne launched MAZ Technologies, Inc., in order to develop security products; it was during his work with this company that Mr. Zizzi developed the patented technologies. (D.I. 14 at ¶ 1; Zizzi Decl. at ¶ 3) MAZ Technologies, Inc. was a Delaware corporation whose offices appear to have been located in Marina Del Rey, California. (D.I. 34 ("Chung Decl."), ex. A; Allen Decl., ex. B) Mr. Zizzi now lives in Glenville, New York, and Mr. Mahne currently resides in Miami, Florida. (D.I. 35 ("Mahne Decl.") at ¶ 4; Zizzi Decl.

3

at ¶ 4)

MAZ Technologies, Inc. assigned the rights to the patents-in-suit to a Texas entity with which Mr. Mitry and Mr. Salmon are affiliated, Empire IP LLC, in October 2012. (D.I. 40 ("Yang Decl."), exs. A & C)  Empire IP LLC, in turn, assigned the patents-in-suit to Plaintiff on February 14, 2013.  (*Id.*, ex. B)

Defendant HP, which bills itself as the "world's largest technology company[,]" is a Delaware corporation; its principal place of business is in Palo Alto, California, which is located in the Northern District of California ("Northern District").  (D.I. 14 at ¶ 3; D.I. 21 at 4; Chung Decl., ex. B)  It employs approximately 331,800 persons worldwide, and had (as of fiscal year 2012) annual revenue exceeding $120 billion (placing it at number 10 in the Fortune 500 rankings).  (Chung Decl., ex. B)  Substantial portions of Defendant's operations and approximately 11,000 of its employees are located in Northern California, including a significant portion of its research and development, marketing, sales and finance operations.  (D.I. 25 ("Harrold Decl.") at ¶¶ 4-9)  Defendant has only a few employees in Delaware in these functions, and none affiliated with this case.  (*Id.* at ¶¶ 7-9)

HP-UX is an operating system on certain HP server products, which Defendant developed and first released in the early 1980s.  (D.I. 22 ("Huck Decl.") at ¶ 3)  EVFS is a software component for the HP-UX 1 1i v2 and HP-UX 1 1i v3 operating systems, which provides certain encryption features.  (*Id.* at ¶ 4)  It was initially designed and developed in the 2000s by two engineers on the HP-UX team: Mehmet Musa and Hemant Mittal.  (*Id.* at ¶ 5; D.I. 23 ("Musa Decl.") at ¶¶ 6-7)  Mr. Musa and Mr. Mittal are no longer employed by Defendant, but are located in the Northern District.  (Musa Decl. at ¶¶ 3-4, 6)  The current Chief Architect of HP-

4

UX is an employee of Defendant, based out of Defendant's Palo Alto headquarters. (Huck Decl. at ¶ 2)

HP ProtectTools (a suite of software providing security-related features) and fingerprint readers are included with certain HP commercial notebook products. (D.I. 24 ("Ali Decl.") at ¶ 3) Substantial portions of these products are supplied to Defendant by third party corporations located in California. (*Id.* at ¶¶ 4-7) The chief architect for early versions of HP ProtectTools is an HP employee based out of HP's offices in Houston, Texas. (*Id.* at ¶¶ 2-3)

## II.   DISCUSSION

### A.   Legal Standard

Section 1404(a) of Title 28 provides the statutory basis for a transfer inquiry. It provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

#### 1.   Appropriateness of Transferee Venue

The first step in the transfer analysis is to determine whether this action could have been brought in the proposed transferee venue. "The party moving for transfer bears the burden of proving that the action properly could have been brought in the transferee district in the first instance." *Mallinckrodt Inc. v. E–Z–Em Inc.*, 670 F. Supp. 2d 349, 356 (D. Del. 2009) (internal quotation marks and citations omitted). Here, there is no dispute that this infringement action could have been properly brought in the Northern District. (D.I. 21 at 10); *see also* 28 U.S.C. § 1400(b).

#### 2.   Applicable Legal Standards

5

"[S]ection 1404(a) was intended to vest district courts with broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30-31 (1988)). The United States Court of Appeals for the Third Circuit has emphasized that when considering a motion to transfer venue pursuant to Section 1404(a), "courts normally defer to a plaintiff's choice of forum" and thus "the plaintiff's choice of venue should not be lightly disturbed." *Id.* at 879-80 (internal quotation marks and citations omitted). This general principle, drawn from the historic respect accorded a plaintiff's choice of venue, suggests that "a transfer is not to be liberally granted." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (internal quotation marks and citation omitted).

The party seeking a transfer has the burden "to establish that a balancing of proper interests weigh[s] in favor of the transfer[.]" *Id.*; *see also Jumara*, 55 F.3d at 879. That burden is a heavy one: "unless the balance of convenience of the parties is *strongly in favor of defendant*, the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25 (internal quotation marks and citation omitted) (emphasis added); *see also CNH Am. LLC v. Kinzenbaw*, C.A. No. 08-945(GMS), 2009 WL 3737653, at *2 (D. Del. Nov. 9, 2009). Accordingly, "transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer." *Angiodynamics, Inc. v. Vascular Solutions, Inc.*, C.A. No. 09-554-JJF, 2010 WL 3037478, at *2 (D. Del. July 30, 2010); *see also Illumina, Inc. v. Complete Genomics, Inc.*, Civil Action No. 10-649, 2010 WL 4818083, at *2 (D. Del. Nov. 9, 2010).

The Third Circuit has observed that, in undertaking this transfer analysis, "there is no

6

definitive formula or list of . . . factors to consider[.]" *Jumara*, 55 F.3d at 879. Instead, courts

must analyze "all relevant factors" to determine whether "the litigation would more conveniently

proceed and the interests of justice be better served by transfer to a different forum." *Id.* (internal

quotation marks and citation omitted). Nevertheless, in *Jumara*, the Third Circuit identified a set

of private interest and public interest factors that should be taken into account in this analysis

(the "*Jumara* factors"). The private interest factors to consider include:

> [1] [The] plaintiff's forum preference as manifested in the original choice,
> [2] the defendant's preference, [3] whether the claim arose elsewhere, [4]
> the convenience of the parties as indicated by their relative physical and
> financial condition, [5] the convenience of the witnesses—but only to the
> extent that the witnesses may actually be unavailable for trial in one of the
> fora . . . and [6] the location of books and records (similarly limited to the
> extent that the files could not be produced in the alternative forum).

*Id.* The public interest factors to consider include:

> [1] [T]he enforceability of the judgment, [2] practical considerations that
> could make the trial easy, expeditious, or inexpensive, [3] the relative
> administrative difficulty in the two fora resulting from court congestion, [4]
> the local interest in deciding local controversies at home, [5] the public
> policies of the fora, . . . and [6] the familiarity of the trial judge with the
> applicable state law in diversity cases.

*Id.* at 879-80. District courts should explicitly consider each of these factors, at least to the

extent that the parties make "arguments" about them. *In re Link_A_Media Devices Corp.*, 662

F.3d 1221, 1224 (Fed. Cir. 2011) (citing *Jumara*, 55 F.3d at 879) (noting that it would be

"improper to ignore" any of the factors in such a circumstance).[5]

### a.    Private Interest Factors

---

[5]       In analyzing a motion to transfer in a patent case, it is the law of the regional
circuit (here, the Third Circuit) that applies. *Intellectual Ventures I LLC v. Checkpoint Software
Techs. Ltd.*, 797 F. Supp. 2d 472, 487 n.7 (D. Del. 2011) (citing *Micron Tech., Inc. v. Rambus
Inc.*, 645 F.3d 1311, 1331 (Fed. Cir. 2011)).

i.      **Plaintiff's choice of forum**

When analyzing the first *Jumara* private interest factor—the "plaintiff's forum preference

as manifested in the original choice"—the court should not consider simply the fact of that

choice, but the reasons behind the choice. *Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No.

11-902-LPS-CJB, 2012 WL 4889438, at *4 & n.5 (D. Del. Oct. 15, 2012) ("*Pragmatus I*")

(citing cases), *report and recommendation adopted*, 2013 WL 174499 (D. Del. Jan. 16, 2013)

("*Pragmatus II*"); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 200 (D. Del. 1998). "If

those reasons are rational and legitimate, then they will weigh against transfer, as they are likely

to support a determination that the instant case is properly venued in this jurisdiction."

*Pragmatus I*, 2012 WL 4889438, at *4 (internal quotation marks and citations omitted); *see also*

*Intellectual Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 753 (D. Del. 2012) ("*Altera*").

On the other hand, where a plaintiff's choice of forum was made for an improper reason—such

as where the choice is arbitrary, irrational, or selected to impede the efficient and convenient

progress of a case—it should not be afforded substantial weight. *Pragmatus I*, 2012 WL

4889438, at *4; *Affymetrix*, 28 F. Supp. 2d at 200 (noting that if a plaintiff had no good reason, or

an improper reason, for filing suit in this District, this would likely weigh in favor of transfer).

Plaintiff cites a number of reasons as to why it chose to file suit in this District.  Among

those are that it did so in a District in which it is has registered as an LLC, and thus where it has

previously availed itself of the benefits and consequences of the State's laws.  (D.I. 33 at 5-7)

This rationale has often been found to be a legitimate one. *See, e.g.*, *Altera*, 842 F. Supp. 2d at

754; *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 479

(D. Del. 2011) ("*Checkpoint Software*").

8

Defendant argues, however, that Plaintiff's choice of forum should be given less weight or no weight at all here, because Plaintiff's "minimal ties to Delaware were manufactured in an apparent attempt to manipulate the venue laws." (D.I. 39 at 2)  In support, Defendant cites to the record, which demonstrates:  (1) the rights to the patents-in-suit were initially owned by MAZ Technologies, Inc. from their inception; (2) they were then assigned in October 2012 to Empire IP, LLC, the Texas entity that is affiliated with Mr. Mitry and Mr. Salmon; (3) Plaintiff was formed on February 13, 2013; (4) the patents-in-suit were assigned to Plaintiff by Empire IP, LLC, on February 14, 2013; and (5) Plaintiff filed the instant suit eight days later, on February 22, 2013.  (D.I. 39 at 2-3 & n.1 (citing Yang Decl., exs. A-C))

The Court agrees that the record clearly suggests a connection between Plaintiff's formation as a Delaware LLC, the assignment of the patents to Plaintiff and the filing of the instant suit in this Court, all of which occurred in relatively short order.  (See Tr. at 41 (Plaintiff's counsel explaining that Plaintiff is a "patent licensing and enforcement entity [that] has chosen to conduct that patent licensing and enforcement business in . . . Delaware"); id. at 63-64 (Plaintiff's counsel acknowledging that Empire IP LLC is a "holding company" that acquired the patents-in-suit and then transferred them to Plaintiff to enforce the patents))  The Federal Circuit has found that, in a case where a plaintiff incorporated in Texas just 16 days before filing litigation in a Texas federal district court, that incorporation was the type of "recent, ephemeral" act taken "in anticipation of litigation" that was done for "no other purpose than to manipulate venue." In re Microsoft Corp., 630 F.3d 1361, 1364-65 (Fed. Cir. 2011);[6] see also Gian

_____

[6]     It is worth noting, however, that in In re Microsoft Corp., the plaintiff took many other actions that also suggested to the Court that it had engaged in inappropriate forum manipulation.  This included the fact that although plaintiff was operated from the United

*Biologics, LLC v. Biomet Inc.*, Civil Action No. 10-865-LPS, 2011 WL 2470636, at *1-3 (D. Del. June 21, 2011) (suggesting that were plaintiff's incorporation in Delaware just prior to the filing of the instant lawsuit to have been "litigation-contrived[,]" this could result in plaintiff's Delaware corporate status being given "no weight" in the transfer calculus).

There are clearly certain circumstances in which a plaintiff's connection to a forum and its choice to file suit there evidence an improper motive—one that is offensive to the kind of even-handed, "balance of convenience" analysis that the Court must undertake as part of the transfer inquiry. One such situation is where the evidence suggests that a party truly chose the instant forum simply to avoid unfavorable rulings that it suffered in a related litigation in the proposed alternative forum (i.e., "classic" forum shopping). *See, e.g.*, *Ross v. Institutional Longevity Assets LLC*, Civil Action No. 12-102-LPS-CJB, 2013 WL 5299171, at *7-9 (D. Del. Sept. 20, 2013); *cf. Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1332 (Fed. Cir. 2011). Another would be where a party points in support to the existence of its office location in its preferred district, but that office is, in fact, nothing more than a "front" or "fraud[]"—a drop-box meant to obscure that the party's real physical location was somewhere else. *See Microsoft Corp. v. Geotag Inc.*, 847 F. Supp. 2d 675, 682 (D. Del. 2012); *see also In re Zimmer Holdings, Inc.*, 609 F.3d 1378, 1381 (Fed. Cir. 2010) ("This is a classic case where the plaintiff is attempting to game the system by artificially seeking to establish venue by sharing office space with another of the trial counsel's clients."). Yet another would be where a party, in anticipation

---

Kingdom, it maintained an office in Texas at which it did not employ any individuals. *In re Microsoft Corp.*, 630 F.3d at 1362, 1364-65. Additionally, the plaintiff's website directed inquiries to that Texas office, but plaintiff's principal simply answered those inquiries from his home in the United Kingdom. *Id.* at 1362.

of litigation, simply moved thousands of key case documents from one district into its preferred

district, so that it could later claim to the court that the location of key documents favored its

position. *See In re Zimmer Holdings, Inc.*, 609 F.3d at 1381 (citing *In re Hoffmann-La Roche*

*Inc.*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009)). In all of these circumstances, there is a kind of

intentional "fiction" being created by the party, in order to wrongfully "manipulate" the court and

the transfer inquiry. *Id.*

The Court is not certain that the creation of a Delaware entity, even very close in time to

the filing of a lawsuit as here, amounts to the same thing (or, at least, that it would always be

easy to tell that it does). After all, "business entities choose their situs of incorporation for varied

reasons, including the ability to sue and be sued in that venue." *Cradle IP, LLC v. Texas*

*Instruments, Inc.*, 923 F. Supp. 2d 696, 699 (D. Del. 2013); *see also Micron Tech.*, 645 F.3d

1332 ("Given that both parties were incorporated in Delaware, they had both willingly submitted

to suit there, which weighs in favor of keeping the litigation in Delaware."). Thus, there is often

an element of "business/litigation strategy" inherent in the decision to form an entity in a

particular state that relates to where that entity wishes to pursue litigation—but that reality does

not generally give rise to the conclusion that the decision itself is a fraud or fiction, nor one born

of illegitimate motives. *Cradle IP, LLC*, 923 F. Supp. 2d at 699 (concluding that plaintiff's

incorporation in Delaware, less than four months before it brought suit in this District, should not

detract from the weight given to plaintiff's choice of forum). And it may be very difficult to

draw principled lines in determining how long or under what circumstances an entity must exist

before its formation amounts to the appropriate kind of business or litigation decision, as

opposed to an inappropriate one that equals venue manipulation.[7]

In the end, as to this first *Jumara* private interest factor, the Court finds that this difficult issue does not drive its conclusion. That is because there are independent reasons cited by Plaintiff as to why it brought suit in this District: it is where *Defendant* is incorporated (and also where certain accused products are sold). These facts, which provide some certainty that there will be personal jurisdiction over Defendant in this District, have often been recognized as legitimate and rational reasons for bringing suit here. *See, e.g., Altera*, 842 F. Supp. 2d at 754; *Checkpoint Software*, 797 F. Supp. 2d at 479; (*cf.* Tr. at 42 (Plaintiff asserting that "Delaware is the only forum in the United States where [Plaintiff] could obtain jurisdiction over [] all of the defendants in all of the related matters"))

Therefore, because there is a clear, legitimate reason why Plaintiff chose this forum for

---

[7]    For example, as noted above, on February 21, 2014—a little over a year after its formation—Plaintiff filed another lawsuit in this Court against a different defendant in Civil Action No. 14-228-LPS. Were a transfer analysis to be undertaken in this most recent lawsuit, it could well be argued that Plaintiff was an "established" Delaware entity at the time of filing, and that its formation in Delaware was neither recent nor ephemeral. *See, e.g., Wireless Recognition Techs. LLC v. A9.com, Inc.*, Nos. 2:10-cv-364-JRG, 2:10-cv-365-JRG, 2:10-cv-577-JRG, 2:10-cv-578-JRG, 2012 WL 506669, at *3 n.6 (E.D. Tex. Feb. 15, 2012) (indicating that the fact that plaintiff was formed in a venue more than four months before it filed suit in that venue was a factor that bore on the conclusion that plaintiff's presence in the venue was not "'ephemeral'") (citing *In re Microsoft Corp.*, 630 F.3d at 1364-65). But would the circumstances in this recently filed case and the instant case really be any different, or one be any more or less indicative of improper venue manipulation than the other? Additionally, in this case, there is the added wrinkle that MAZ Technologies, Inc.—the entity at which the inventor worked when conceiving of the patented technology, and the entity that held the rights to the patents for some significant period of time—was a Delaware corporation. Does that suggest there is some greater, longer-standing connection between the patents-in-suit and Delaware entities, one that might be said to counter the narrative put forward by Defendant of inappropriate forum manipulation? *Cf. Checkpoint Software*, 797 F. Supp. 2d at 480 (finding that although plaintiff had organized in Delaware only a month before filing the instant suit, this factor did not detract from the weight given to its choice of forum, since all entities previously affiliated with the patents-in-suit had been organized under the laws of Delaware).

suit (one that should be credited regardless of whether or how long Plaintiff had been formed as a Delaware LLC), this factor weighs against transfer.

### ii.   Defendant's forum preference

As for the second private interest factor, the defendant's forum preference, Defendant prefers to litigate in the Northern District. (D.I. 21 at 1, 11)  In analyzing this factor, our Court has similarly "tended to examine whether the defendant can articulate rational, legitimate reasons to support that preference." *Pragmatus I*, 2012 WL 4889438, at *6 (citation omitted).

Defendant argues throughout its briefing that it has a number of legitimate reasons for seeking to transfer this action to the Northern District.  These include the fact that its headquarters are located there, as are many likely party and non-party witnesses and relevant documents. (D.I. 21 at 1, 11)  This Court has often held that the physical proximity of a defendant's place of business (and relatedly, to witnesses and evidence potentially at issue in the case) to the proposed transferee district is a clear, legitimate basis for seeking transfer to that district. *See, e.g., Joao Control & Monitoring Sys., LLC v. Ford Motor Co.*, C.A. No. 12-cv-1479 (GMS), 2013 WL 4496644, at *4 (D. Del. Aug. 21, 2013); *Fuisz Pharma LLC v. Theranos, Inc.*, Civil Action No. 11-1061-SLR-CJB, 2012 WL 1820642, at *12 (D. Del. May 18, 2012) (citing cases); *Altera*, 842 F. Supp. 2d at 755; *Checkpoint Software*, 797 F. Supp. 2d at 479.[8]

---

[8]      Plaintiff notes, (D.I. 33 at 7), that there is case law from this Court standing for the proposition that "Defendants' preference for an alternative forum is not given the same weight as Plaintiff's preference." *Altera*, 842 F. Supp. 2d at 755. The Court believes this is correct in the sense that, under *Shutte, Jumara* and their progeny, it was the historical respect given to a *plaintiff's* forum choice that led to *Shutte*'s requirement that the overall balance of convenience should have to tip "strongly in favor of defendant" for transfer of venue to be granted. *Pragmatus I*, 2012 WL 4889438, at *7. However, authority from the Third Circuit does not suggest that the weight accorded to *this particular Jumara factor* should automatically be reduced or lessened in every case, as compared to the weight accorded to the first private interest

Thus, the second private interest *Jumara* factor weighs in favor of transfer.

### iii. Whether the claim arose elsewhere

The third private interest *Jumara* factor asks "whether the claim arose elsewhere." "[A] claim for patent infringement arises wherever someone has committed acts of infringement, to wit, 'makes, uses, offers to sell, or sells any patented invention' without authority." *Cellectis S.A. v. Precision Biosciences, Inc.*, 858 F. Supp. 2d 376, 381 (D. Del. 2012) (quoting 35 U.S.C. § 271(a)). When assessing this factor, however, our Court has often focused in particular on the activity surrounding the production, design and manufacture of the allegedly infringing product. *See, e.g., Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*, C.A. No. 12-cv-139 (GMS), 2013 WL 3293611, at *3 (D. Del. June 28, 2013); *Altera*, 842 F. Supp. 2d at 755.

Defendant asserts that a significant number of the events giving rise to the infringement claims in this case (i.e., regarding the design, development, marketing and sales of the accused products) occurred in or near the Northern District. (D.I. 21 at 12) For its part, Plaintiff argues that its "claim arises in this District" because "some accused products have been sold in" Delaware (and throughout the United States). (D.I. 33 at 8-9)

Even taking into account Defendant's nationwide sales, the record at this stage suggests that a significant portion of the acts giving rise to Plaintiff's claims of infringement have a strong connection to the Northern District (one far stronger than their connection to Delaware or any

---

factor. *Id.* Instead, this factor was simply listed as one of many that the *Jumara* Court found to be relevant in the transfer analysis. *Cf. In re Amendt*, 169 F. App'x 93, 96 (3d Cir. 2006) (examining the first two *Jumara* private interest factors—plaintiff's choice of forum and defendant's forum preference—and suggesting that because elements of the claims at issue arose in both fora, such that there were legitimate reasons for the parties to choose to litigate in their respective fora, any weight afforded to plaintiff's choice as to the first factor was effectively cancelled out by the weight afforded to defendant's choice as to the second).

other district). (Ali Decl. at ¶¶ 4-7; Huck Decl. at ¶¶ 5-7) The EVFS product was developed in the Northern District in the 2000s (though since 2012, some smaller amount of development work has occurred in India). (Huck Decl. at ¶¶ 5-7; Musa Decl. at ¶¶ 5-6) The HP ProtectTools product may have originally been developed in Texas, but since 2008, substantial portions of the development of the product has been performed in Northern California; the fingerprint readers at issue, too, are developed in Northern California. (Ali Decl. at ¶¶ 3-7)

In such a circumstance, the Court finds that this factor weighs in favor of transfer. *See Altera*, 842 F. Supp. 2d at 755 (finding this factor to weigh in favor of transfer where, *inter alia*, some research and development of allegedly infringing products occurred in proposed transferee district and none in Delaware, although the allegedly infringing products were sold nationwide); *cf. Checkpoint Software*, 797 F. Supp. 2d at 481 (finding that this factor "slightly" favored transfer, where "some amount" of the research and development of some of the accused products and services was conducted in the transferee district, but where the "bulk" of that activity occurred outside of the transferee district).

### iv.     Convenience of the parties as indicated by their relative physical and financial condition

In assessing the next private interest factor—"the convenience of the parties as indicated by their relative physical and financial condition"—this Court has traditionally examined issues including: "(1) the parties' physical location; (2) the associated logistical and operational costs to the parties' employees in traveling to Delaware (as opposed to the proposed transferee district) for litigation purposes; and (3) the relative ability of each party to bear these costs in light of its size and financial wherewithal." *Audatex*, 2013 WL 3293611, at *4 (citations omitted); *McKee v. PetSmart, Inc.*, C.A. No. 12-1117-SLR-MPT, 2013 WL 1163770, at *4 (D. Del. Mar. 20,

2013) (citations omitted).

Defendant argues that because its business is headquartered in the Northern District, and because many of the "relevant HP witnesses" would be required to travel from California to Delaware to testify, it will be required to "incur significant travel expenses to litigate in Delaware." (D.I. 21 at 13)  Conversely, it asserts that litigating the case in the Northern District "would significantly reduce the travel burdens on HP's relevant witnesses and the disruptions to their work." (*Id.*)  Certainly from a geographical perspective, litigating in the Northern District (as opposed to Delaware) would be more convenient for Defendant and its employees.

Yet Defendant is, by all accounts, a global corporation—one that, according to its marketing materials, is the "world's largest technology company[.]" (Chung Decl., ex. B)  It has annual revenue that in the recent past has exceeded $120 billion, and has offices and hundreds of thousands of employees throughout the world, including in Delaware.  And it is certainly no stranger to Delaware, having decided to incorporate in the state for business purposes. *See Altera*, 842 F. Supp. 2d at 756 (noting that due to defendants' status as Delaware corporations, it was an "uphill climb" for them to argue that litigating in Delaware was decidedly inconvenient) (citing *Micron Tech.*, 645 F.3d at 1332).  The Court is thus unpersuaded that—for the small number of Defendant's employees who would be required travel to Delaware during this case—such travel would amount to any "significant" disruption (financial or otherwise) to Defendant. *See, e.g., id.* at 755 (noting that there was nothing in the record to indicate that litigating in Delaware would impose an "undue financial burden" on defendants, where defendants had extensive United States and worldwide operations, employed hundreds or thousands of workers and each had annual sales of at least $250 million and as much as over $1

16

billion); *Checkpoint Software*, 797 F. Supp. 2d at 481 (finding that it was "implausible" that

litigating one patent infringement action in Delaware would "'significantly disrupt'" defendants'

businesses, where each defendant was a "global corporation, employing at least 1,000 people,

and earning revenues in excess of $1 billion").[9]

There is little in the record about Plaintiff's history or financial condition, other than the

facts that it has two members who live on the East Coast, that those members are principals of

other, similar corporate entities, and that these men report that MAZ has "no revenue." (Mitry

Decl. at ¶¶ 2-3; Salmon Decl. at ¶¶ 2-3; Yang Decl., exs. E-K) From this limited information, it

is clear that it would be easier for Plaintiff's members to travel to Delaware (as opposed to the

Northern District) for litigation. There might be some reason to believe (as Plaintiff suggests)

that "[g]iven its significantly smaller financial size, it would impose a significant hardship on

MAZ to simultaneously litigate the same asserted patents on two opposite ends of the country."

(D.I. 33 at 10); *cf. Robocast, Inc. v. Apple, Inc.*, Civil Action Nos. 11-235-RGA, 10-1055-RGA,

2012 WL 628010, at *2 (D. Del. Feb. 24, 2012) (finding that this factor "significantly

disfavor[ed] transfer" where defendant is a "large and powerful corporation" that is "omnipresent

in everyday life" and "[would] have the upper hand" if the matter turned into a "war of

attrition[,]" while plaintiff's financial condition "pale[d] in comparison [to defendant's]" and

---

[9]     Moreover, while there would be some additional inconvenience to Defendant's
employee witnesses, were they obligated to travel to Delaware for pre-trial or trial proceedings,
the amount of such travel is not likely to be large—particularly if this case does not result in a
trial. *See, e.g., Human Genome Scis., Inc. v. Genentech, Inc.*, C.A. Nos. 11-082-LPS, 11-156-
LPS, 11-328-LPS, 2011 WL 2911797, at *7 (D. Del. July 18, 2011) (noting that the likelihood
that few case events would occur in Delaware—particularly few if the case did not go to
trial—weighed against transfer, as did technological advances that allow traveling employees to
more easily interact with their office while away).

there was "little reason to believe that its pockets are deep[,]" due to statements plaintiff made to the Court). But the Court is not prepared to make too much of that disparity here, given the lack of detailed information about Plaintiff's finances in the record, and the reality that Plaintiff's members can and have initiated litigation here and in other courts.

In the end, with the parties each far closer to their respective court of choice, with a seemingly large imbalance in the parties' relative size, but with little ability to discern the true state of Plaintiff's financial condition, the Court finds that this factor should weigh against transfer, but only very slightly. *See Ross*, 2013 WL 5299171, at *11 (finding factor to weigh against transfer, though only slightly, where record suggested an imbalance, to the plaintiff's detriment, in the parties' ability to afford litigation in the transferee district, but where the record was "sparse" as to the plaintiff's financial status); *cf. Microsoft Corp.*, 847 F. Supp. 2d at 678.

v.  **Convenience of the witnesses to the extent that they may actually be unavailable for trial in one of the fora**

The "convenience of the witnesses" is the next factor, "but only to the extent that the witnesses may actually be unavailable for trial in one of the fora[.]" *Jumara*, 55 F.3d at 879. "[I]n reviewing a motion to transfer, courts frequently look to the availability of witnesses as an important factor, as it can be relevant to protecting a defendant's opportunity to put on its case with witnesses who will appear in person at the trial." *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 569 (D. Del. 2001). In explaining how the concerns implicated by this factor relate to the different types of witnesses who might testify at trial, this Court has noted:

> Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed, obligated to procure the attendance of its own employees for trial. . . . Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where

18

> the "balance of convenience" lies (especially in an action for patent
> infringement) because they "are usually selected [on the basis] of
> their reputation and special knowledge without regard to their
> residences and are presumably well compensated for their
> attendance, labor and inconvenience, if any.". . . Fact witnesses who
> possess first-hand knowledge of the events giving rise to the
> lawsuit, however, have traditionally weighed quite heavily in the
> "balance of convenience" analysis.

*Affymetrix,* 28 F. Supp. 2d at 203 (citations omitted).  Of particular concern, then, are fact

witnesses who may not appear of their own volition in the venue-at-issue and who could not be

compelled to appear by subpoena pursuant to Federal Rule of Civil Procedure 45.  *ADE Corp.,*

138 F. Supp. 2d at 569.

  As an initial matter, our Court has noted that the practical impact of this factor is limited,

in light of the fact that so few civil cases today proceed to trial (and at trial, so few fact witnesses

testify live).  *Cellectis,* 858 F. Supp. 2d at 382 n.6; *Altera,* 842 F. Supp. 2d at 757-58.  A party's

ability to put forward testimony of witnesses of its choosing at trial is, of course, important; these

cases simply recognize that the impact of this factor has to be tempered a bit by the unlikely

event of a trial's occurrence.

  Defendant argues that this factor favors transfer, because the two main architects of EVFS

who are the most knowledgeable individuals about its design and development are no longer HP

employees, but are still located in the Northern District.  (D.I. 21 at 14)  However, Defendant

puts forward evidence regarding the impact of the litigation on only one of those two men:  Mr.

Musa.  He, in turn, states that it would be "personally and professionally disruptive for me to

travel to Delaware" for trial in this case.  (Musa Decl. at ¶ 9)  Yet, as Plaintiff notes, (D.I. 33 at

13), that is far from a statement that he would be unavailable for trial; in fact, earlier in his

Declaration, Mr. Musa states that if called to testify in the case as to the contents of the

19

Declaration itself, he "could and would do so under oath[,]" (Musa Decl. at ¶ 1).

Defendant also notes that certain third party vendors that supply HP with software and hardware components relevant to the infringement allegations are located in the Northern District. (D.I. 21 at 14) It could be that certain employees of these vendors would be needed to testify at trial, though it is difficult to know at this stage. There has been no real showing made as to any specific person, however, nor to their *unavailability* for trial.[10]

Lastly, Defendant notes that the inventions were conceived by Mr. Zizzi when he worked at MAZ Technologies, Inc.; it asserts that because it appears that MAZ Technologies, Inc. once had its principal place of business in California, former employees of the company who "are likely to be located in California today" may be key witnesses. (*Id.* at 14-15) But as Plaintiff notes, Mr. Zizzi himself, as the inventor of the patents-in-suit, is the most important former MAZ Technologies, Inc. third party witness for purposes of this case—and he lives in New York, far closer to the instant venue than the Northern District. (D.I. 33 at 14-15) The one other former MAZ Technologies, Inc. employee who has been identified (its former President, Mr. Mahne) lives in Florida—somewhat closer to the instant venue than the Northern District—and both he and Mr. Zizzi state that they are "not aware of" any former MAZ Technologies, Inc. employees living in California. (Mahne Decl. at ¶ 6; Zizzi Decl. at ¶ 6)

In sum, of the possibly relevant third party trial witnesses identified by the parties, some live closer to Delaware, while a few more live closer to or in the Northern District. Yet even as

---

[10]     Indeed, the person who has been most concretely identified as having knowledge of the HP ProtectTools accused product is the chief architect for the early version of the product. He works for Defendant in Texas, about halfway between the disputed venues. (Ali Decl. at ¶¶ 2-3; Tr. at 27)

to the third parties cited by Defendant, there is no strong showing that any of these persons will

be unlikely to testify at trial, such that it is difficult to give Defendant's argument as to their

potential unavailability great weight. *See, e.g., Pragmatus I*, 2012 WL 4889438, at *10-11;

*Tessera, Inc. v. Sony Elecs. Inc.*, Civil No. 10-838 (RMB) (KW), 2012 WL 1107706, at *6 (D.

Del. Mar. 30, 2012); *Checkpoint Software*, 797 F. Supp. 2d at 484.

The Court thus finds that this factor slightly favors transfer.

### vi.   Location of books and records

Next the Court considers "the location of books and records (similarly limited to the

extent that the files could not be produced in the alternative forum)." *Jumara*, 55 F.3d at 879.

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused

infringer. Consequently, the place where the defendant's documents are kept weighs in favor of

transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (internal

quotation marks and citation omitted).

This factor is commonly given little weight, however, as technological advances have

"shortened the time it takes to transfer information, reduced the bulk or size of documents or

things on which information is recorded . . . and have lowered the cost of moving that

information from one place to another." *Cypress Semiconductor Corp. v. Integrated Circuit Sys.,

Inc.*, No. 01-199-SLR, 2001 WL 1617186, at *3 (D. Del. Nov. 28, 2001) (internal quotation

marks and citation omitted); *see also Cellectis*, 858 F. Supp. 2d at 382; *ADE Corp.*, 138 F. Supp.

2d at 571 ("With new technologies for storing and transmitting information, the burden of

gathering and transmitting documents 3,000 miles is probably not significantly more than it is to

transport them 30 miles."). Yet while the practical reality of these advances in technology may

21

alter the weight given to this factor, a court should not ignore the factor entirely. *Link_A_Media*, 662 F.3d at 1224.

Here, it is not really disputed that the bulk of relevant documents and evidence regarding infringement are likely to be found in or near the Northern District. (D.I. 21 at 16; D.I. 33 at 15) Additionally, there is no indication that, given technological advances in the production of documents, it will be particularly burdensome to produce such documents in Delaware (as opposed to the Northern District) for trial.[11] In such circumstances, our Court has often found this factor to weigh in favor of transfer, though only slightly. *See, e.g., Joao Control*, 2013 WL 4496644, at *6; *Altera*, 842 F. Supp. 2d at 759; *Checkpoint Software*, 797 F. Supp. 2d at 485. The Court comes to the same conclusion here.

### b.    Public Interest Factors

#### i.    Enforceability of judgment

Neither party has offered any reason why a judgment entered in either district would not be given full faith and credit. This factor is neutral. *See In re DVI Inc.*, No. 03-12656 MFW, Civ.A. 04-170 JJF, 2004 WL 1498593, at *3 (D. Del. June 23, 2004) (citing *Hechinger Inv. Co. of Del., Inc. v. M.G.H.*, 288 B.R. 398, 403 (Bankr. D. Del. 2003)).

#### ii.    Practical considerations that could make the trial easy, expeditious, or inexpensive

---

[11]    Defendant does assert that given the "little" it knows about the allegations, "HP's source code will be relevant, the transportation of which [from the Northern District for trial, if trial occurs] raises significant confidentiality concerns." (D.I. 39 at 8-9) Considering that this risk (if even necessary to confront) should be able to be well managed with thoughtful preparation, *see Pragmatus I*, 2012 WL 4889438, at *11, it does not change the Court's view as to the appropriate amount of weight to afford this factor, *see Audatex*, 2013 WL 3293611, at *6 (finding that this factor weighed "slightly in favor of transfer" where defendant cited fact that certain sources of proof, including source code, were found in proposed transferee district).

The Court next considers the "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara*, 55 F.3d at 879.  The most significant practical consideration not directly addressed by other *Jumara* factors[12] are the presence of the other related actions brought in this District by Plaintiff.  *See Ross*, 2013 WL 5299171, at *13 ("In examining this *Jumara* factor, our Court has often cited the existence of related lawsuits in one of the fora at issue as being an important 'practical consideration' to be taken into account.").

As is noted *supra*, these ten related cases each involve infringement claims brought by Plaintiff against nine different defendants and regarding different products.  But nearly all (seven of the other nine related cases) of them involve allegations of infringement of one or both of the patents-in-suit, such that many common issues (regarding, *inter alia*, discovery, claim construction, and patent validity) would likely be addressed in each.  (D.I. 33 at 15-17)[13]  In numerous recent cases where a single defendant sought to transfer its case—thereby seeking to separate that case from other related, pending cases that would remain in this District regardless of how the motion to transfer was decided—our Court has recognized the efficiencies that could be captured were the motion denied and all related cases litigated together here.  *See, e.g.,*

---

[12]     Defendant asserts that other "[p]ractical considerations" weigh in its favor, including that were the case to be tried in this District, this:  (1) would result in substantially higher litigation costs and greater disruption to it than litigating in the Northern District; and (2) would be less convenient for certain third party witnesses and might jeopardize their availability at trial.  (D.I. 21 at 16-17)  However, because Defendant raised these exact issues, in exactly the same way, as to other *Jumara* factors, (*id.* at 12-14), the Court will consider these issues in its analysis of those other factors (and not "double-count" them here).  *Cf. McRo, Inc. v. Activision Blizzard, Inc.*, Civil Action Nos. 12-1508-LPS-CJB, 12-1511-LPS-CJB, 12-1512-LPS-CJB, 12-1518-LPS-CJB, 2013 WL 6571618, at *12 n.15 (D. Del. Dec. 13, 2013).

[13]     Indeed, here, one consolidated Scheduling Order is presently contemplated in all of the cases (with the exception of the most recently filed case), including this one (were the case not to be transferred).

*Graphics Props. Holdings Inc. v. Asus Computer Int'l, Inc.*, C.A. No. 12-cv-00210-LPS, 2013 WL 3295618, at *7 (D. Del. June 28, 2013) (finding this factor to weigh "heavily against transfer" where the court had "at least 11 other cases pending in Delaware, each of which involves one or more of the asserted patents[,]" such that "even if the present case were transferred to California, the Court would still need to learn the technology claimed in the asserted patents, construe the claims of those patents, resolve summary judgment motions (if any), address the parties' discovery disputes, and ultimately try the cases that proceed to trial"); *Pragmatus II*, 2013 WL 174499, at *1; *see also Schubert v. Cree, Inc.*, Civil Action No. 12-922-GMS, 2013 WL 550192, at *5 (D. Del. Feb. 14, 2013); *AIP Acquisition LLC v. iBasis, Inc.*, Civil Action No. 12-616 GMS, 2012 WL 5199118, at *5 (D. Del. Oct. 19, 2012). The Federal Circuit has also acknowledged that such an analysis is appropriate as to this type of factor. *See In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) (citing "the existence of multiple lawsuits involving the same issues" as a "paramount consideration when determining whether a transfer is in the interest of justice"); *see also In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010).

While certainly not dispositive to the overall inquiry, this practical consideration is nevertheless relevant and should be given weight. *See Smart Audio Techs., LLC v. Apple, Inc.*, 910 F. Supp. 2d 718, 733 (D. Del. 2012) (finding it permissible to consider the existence of three related lawsuits in this jurisdiction when considering transfer of venue as to the instant case, even though the defendants in the related cases could not have been joined in one action, in light of concerns regarding conservation of judicial time and resources). As a result, and taking into account the number of related cases and the degree of overlap of patents, the Court finds this

24

factor to weigh against transfer.

### iii.    Administrative difficulties in getting the case to trial

The next factor is the "relative administrative difficulty in the two fora resulting from court congestion[.]" *Jumara*, 55 F.3d at 879.  Defendant asserts that this factor favors transfer, citing the heavier patent case load in this District, as compared to that in the Northern District, from October 2007 through September 2012. (D.I. 21 at 17)  Plaintiff, however, counters by citing statistics for the period ending September 2012 that indicate that the average time to trial in this District is approximately three months faster than the average time to trial in the Northern District. (D.I. 33 at 17)  The statistics cited by the parties, and particularly by Plaintiff, do not indicate any meaningful difference in the time to resolution or trial for patent cases in this District as compared to the Northern District. *See, e.g.*, *Pragmatus I*, 2012 WL 4889438, at *13 (concluding that the relative court congestion did not favor transfer in part due to the fact that the transferee district's average time to trial was only .85 months less than this District, and the average time to disposition was 3.1 months less); *Checkpoint Software*, 797 F. Supp. 2d at 486 (concluding the same, where the difference in time to trial favored the transferee district by 3.7 months, an "'inconsequential'" amount) (internal citation omitted).

Under such circumstances, this factor is neutral.

### iv.    Local interests in deciding local controversies at home

In patent litigation, the local interest factor is typically neutral, as patent issues tend to raise controversies that are more properly viewed as national, not local, in scope. *Graphics Props.*, 2013 WL 3295618, at *7.  Nevertheless, "[w]hile the sale of an accused product offered nationwide does not give rise to a substantial interest in any single venue . . . if there are

25

significant connections between a particular venue and the events that gave rise to a suit, this factor should be weighed in that venue's favor." *In re Hoffmann–La Roche*, 587 F.3d at 1338 (citations omitted); *see also Graphics Props.*, 2013 WL 3295618, at *7.

Defendant suggests that the Northern District has a local interest regarding these actions because it is a major employer in that district. (D.I. 21 at 18)  The Court recognizes the possibility that Defendant's employees in California may be affected by the outcome of this litigation, but this consideration is tempered by the fact that there is little in the record to gauge how deep or meaningful that impact might be.

Plaintiff, on the other hand, argues that Delaware "'has a strong interest in adjudicating disputes among its corporate citizens.'"  (D.I. 33 at 18 (quoting *Altera*, 842 F. Supp. 2d at 760))  Our Court has found this to be particularly so in a case involving litigation "solely among Delaware corporations."  *Altera*, 842 F. Supp. 2d at 760.  The Court is not convinced that the nature of that interest would meaningfully differ depending on the amount of time that Plaintiff has been registered as a Delaware LLC.

With both sides able to claim some tangible local interest, but with the nature of that interest not strongly developed by either side, the Court finds that as Defendant suggests, (Tr. at 18), this factor is neutral.  *See, e.g.*, *Checkpoint Software*, 797 F. Supp. 2d at 486; *Altera*, 842 F. Supp. 2d at 760; *cf. In re Amendt*, 169 F. App'x 93, 97 (3d Cir. 2006) (finding that the "interests of the two fora in deciding the controversy appear roughly equal because the [plaintiffs] live in [the district in which the case was filed], but [defendant] is headquartered in [the transferee district]").

v.     **Public policy of the fora**

26

Plaintiff argues that the next factor, regarding the public policy of the respective fora, should disfavor transfer, noting this Court's prior statements that the "'public policy of Delaware encourages the use by Delaware corporations of Delaware as a forum for resolution of business disputes.'" (D.I. 33 at 18 (quoting *Graphics Props.*, 2013 WL 3295618, at *7)) Defendant urges that "[p]ublic policy weighs in favor of transfer because it would discourage venue manipulation as practiced by MAZ and its principals, reduce the artificial leverage that MAZ hopes to maintain by imposing unnecessary litigation costs on HP, and would be consistent with the principles underpinning transfer law and the America Invents Act." (D.I. 39 at 10)

Again, the Court is not persuaded that the strength of Delaware's public policy interest would wax or wane greatly because of the amount of time that a plaintiff (or defendant) had been in existence as a Delaware entity. That interest suggests that this factor disfavors transfer, but the Court finds that it should be given no more than "minimal weight." *Altera*, 842 F. Supp. 2d at 760.

### vi.    Familiarity of the trial judge with applicable state law in diversity cases

This is not a diversity case. "[P]atent claims are governed by federal law, and as such both [courts are] capable of applying patent law to infringement claims." *In re TS Tech USA Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008) (internal quotation marks and citation omitted); *see also Altera*, 842 F. Supp. 2d at 760 (same). This factor is therefore neutral.

### c.    Conclusion Regarding Impact of *Jumara* Factors

In sum, Plaintiff's choice of forum and the "practical considerations" factor weigh squarely against transfer, while the "convenience of the parties" factor and the public policy of

the respective fora weigh slightly against transfer. Defendant's forum preference and whether the claim arose elsewhere weigh squarely in favor of transfer, while the "convenience of the witnesses" factor and the location of books and records weigh slightly in favor of transfer. The remainder of the *Jumara* factors are neutral.

Ultimately, with the factors in equipoise, Defendant has not met its burden to show that the balance of convenience of the parties is strongly in its favor. The Court therefore recommends that the Motion be DENIED.

## III.   CONCLUSION

For the foregoing reasons, I recommend that the Court DENY the Motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **March 12, 2014** for review by the Court, along with a

submission demonstrating why there is good cause for the redactions and why disclosure of the redacted material would "work a clearly defined and serious injury to the party seeking" redaction. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: March 6, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE